UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X
SCOTT COHEN,

                Plaintiff,

   -against-                                  **COMPLAINT**

INSTITUTIONAL INVESTOR,                Dkt. No.: 24-CV-5963

                Defendants.
------------------------------------------------------------------------X

      Plaintiff, SCOTT COHEN, by and through his attorneys, RICOTTA & MARKS, P.C., complaining of Defendants herein, alleges, upon knowledge as to himself and his own actions, and upon information and belief as to all other matters, as follows:

## JURISDICTION AND VENUE

1. This action is brought pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000-e, *et seq.,* and any other cause of action which can be inferred from the facts set forth herein to redress acts of unlawful discrimination and retaliation which occurred during the course of Plaintiff's employment with Defendant.

2. The jurisdiction of this Court is invoked under 28 U.S.C. § 1331, the doctrine of pendant jurisdiction and the aforementioned statutory and constitutional provisions.

3. Venue is proper pursuant to 28 U.S.C. § 1391.

1

4. All conditions precedent to maintaining this action have been fulfilled. Moreover, a charge of discrimination was filed with the Equal Employment Opportunity Commission ("EEOC"). A right to sue letter was issued on May 17, 2024. This action was properly instituted within ninety (90) days of the issuance of said letter. A copy of said letter is attached hereto as Exhibit "A".

## PARTIES

5. At all relevant times mentioned, Plaintiff Scott Cohen ("Cohen") was a resident of the County of Nassau, State of New York during the applicable time period referenced below.

6. Defendant, Institutional Investor ("Institutional"), was and still is a business with corporate offices located at 1270 Avenue of the Americas, Suite 1100, New York, NY 10026.

## FACTS

1. Scott Cohen ("Cohen") is a male.

2. In 2013, Cohen commenced his employment with Institutional Investor ("Institutional"), as a Senior Investor Relations Manager.

3. In or around February 2014, as a result of Cohen's excellent performance he was promoted to the position of Deputy Director Investor Relations.

4. In or about September 9, 2019, again as a result of Cohen's work performance, he was promoted to Executive Director, Investor Relations.

5. On or about June 5, 2020, Carolyn Leven ("Leven"), Executive Director, on a group email with Institutional's entire Investor Relations Team ("IR"), criticized Cohen on his contribution rate, despite the fact that Leven was not Cohen's supervisor. In fact, Leven had been promoted to Executive Director at the same time as Cohen, and the email containing that announcement dated September 9, 2019, specifically stated "…New York-based IR team will continue reporting to Katrina Racek, Managing Director, Global Head of Investor Relations]." Similarly situated female employees were not subject to such public criticism without a valid basis, and certainly not by someone who was not their supervisor.

6. On or about June 5, 2020, Cohen emailed Leven explaining his contribution rate, and asked politely to have his supervisor, Racek, resolve this matter.

7. That same week, Cohen spoke with Racek and complained that Leven was treating Cohen unfairly because he was male.

8. In or around June 8, 2020, Racek spoke with Leven and explained to her that she was discriminating against Cohen.

9.  That same week, Cohen asked Racek to advise Narupa Moonsammy ("Moonsammy"), Human Resources for Respondent of Leven's discriminatory actions because he wanted Human Resources to investigate his complaint. Cohen further told Racek that he wanted Leven to apologize for her discriminatory action. Rather than address Cohen's concerns about discrimination, Racek said that she did not want this incident to "blow up" into something bigger.

10. The following week, Cohen again asked Racek to speak with Moonsammy, as she had not done so, and Leven had not apologized.

11. On or about June 15, 2020, Racek and Narupa advised Cohen that they would not investigate Cohen's claims, nor would they ask Leven to apologize for her discriminatory act. Human Resources indicated that they were more concerned about the "culture" than Cohen's complaints. Moreover, Racek claimed to Cohen that his complaint was not getting resolved because he wanted human resources involved, despite the fact that prior to having human resources involved, Racek was taking no real actions to address the situation. Further, no action was taken with respect to the IR team to address Leven's inappropriate actions, nor did Human Resources ever contact Cohen to address his complaint.

12. From in or around July to October 2021, Racek was out on medical leave. All of the employees were instructed not to contact Racek while she was on leave. However, as

detailed below, this instruction, only applied to Cohen and not his female co-workers.

13. In or about the end of July 2021, Institutional employees, including Cohen went to a conference in Colorado with clients. When Cohen arrived from the airport, his hotel room was not ready. Evidencing his dedication to Institutional, Cohen, rather than merely wait for his room, went to the conference center to see if Respondent needed anything or if he could assist in any way before his room was ready. Rather than acknowledge Cohen's dedication, Fran Cashman ("Cashman"), CEO Asset Manager Division then accused Cohen of being "unprofessional," because he was not in business attire, despite the fact that he had just come in from the airport and his hotel room was not ready so he could not change, which he advised Cashman in the elevator. Further, at no point did Cashman speak to Cohen about it directly, he was notified of this complaint by Racek in the phone call detailed below.

14. In or around the end of July 2021, Racek, who was on medical leave, called Cohen informing him that Cashman was upset with Cohen and (falsely) claimed that he was rude to her in a meeting the previous week. According to Racek, Cashman was complaining that during this meeting Cohen was "pushing" for new hires. As Cohen explained, these allegations were completely inaccurate. Cashman had said she was there to help the team, then asked the team if they needed anything. Prior to Racek going on medical leave, she and Cohen had discussed the need for more employees to address an issue with Salesforce and training in-house and high turnover in the IR team. In fact, Racek sent an

email to that effect on July 16, 2021. Given that Cashman had been appointed around May 2021, Racek was on medical leave, not a part of that call, and Cohen did not know if Racek had raised the issue with Cashman prior to going on medical leave, he politely raised the issue of additional employees and summarized his discussion with Racek and the line of reasoning leading to the suggestion. Institutional subsequently hired the person who was the subject of this issue. Similarly situated female employees were not accused or disciplined for being rude without a basis in fact.

15. During this same phone call, Racek informed Cohen that Cashman complained that he was not sitting with clients during the dinner in Colorado. At no point did Cashman speak to Cohen about him not sitting with clients during dinner. As Cohen explained to Racek, the clients sat down first, and there were no seats available at their tables for Cohen by the time he was ready to take a seat. Often at similar dinners, employees would not sit with clients during dinner, sometimes deliberately so. Moreover, these were not clients of Cohen. Similarly situated female employees were not disciplined or singled out, despite the fact that several employees did not sit with clients during this dinner and despite the fact that the clients were clients of those employees.

16. According to Racek, Cashman also complained that Cohen brought his girlfriend Anna to the dinner in Colorado. However, as Cohen explained, Anna was invited to attend by another of Respondent's Executive Directors, not Cohen. Moreover, a female coworker sat with her boyfriend at a table without clients at the same dinner, yet was not disciplined

6

in any way.

17. Shortly after this conference, Racek informed Cohen that Human Resources contacted her, and that Cohen should no longer talk in meetings because of Cashman's (baseless) complaints detailed above. Racek instructed Cohen to speak with Moonsammy for more information.

18. That same day, Cohen called Moonsammy. Moonsammy vaguely explained that "people" were complaining about Cohen, but would not give any further information as to whom, nor would she tell Cohen what complaints had been made, except that Cashman thought Cohen was unprofessional. Moonsammy again mentioned the issues with Cohen being at the conference in shorts and not sitting with clients. Cohen again explained the circumstances as detailed above, and further informed Moonsammy that many employees were not sitting with clients. When Cohen asked Moonsammy what policy he breached or what he had done wrong (so that he could correct the issue), or whether there had perhaps been a change in policy of which he was unaware, Moonsammy acknowledged that there was no policy that he violated and again raised the issue of him not having dinner with clients, despite several female employees also not sitting with clients at that time, that the clients were clients of female employees, and the fact that there were no seats at the clients' table. When Cohen asked why he was being singled out, Moonsammy would not answer, and instead informed Cohen than Cashman did not want

7

Cohen to participate in team calls anymore, claiming that Cohen is not a good "people manager," despite the fact that he had done nothing wrong, and the conference was the first time Cohen actually met her. Further, Cohen was informed that the IR team would now be reporting to Archana Kapur ("Kapur"), female, Executive Director, Investor Relations (promoted in 2021), and he was not to join the phone calls anymore. While Racek had left leadership to Cohen and Kapur jointly, Cashman had decided to override her. At no point has Racek, Moonsammy, or anyone else at Respondent ever advised Cohen what he did that Cashman took exception to, other than as detailed above, evidencing that Respondent was not interested in resolving these fictitious "issues" but rather looking to punish Cohen.

19. On or about November 9, 2021, Cohen was on a call with Kapur and Cohen's team to discuss ongoing projects. Despite having the same title, Kapur had less experience than Cohen and started at Respondent after Cohen. During this call, Kapur and Cohen disagreed on a business issue. Kapur became very aggressive and offensive with Cohen in front of the team. Cohen had suggested they target requests to increase the likelihood of a favorable response, given the schedule of upcoming events. Kapur repeatedly mischaracterized Cohen's suggestion and kept falsely claiming that Cohen was unwilling to call allocators, when he clearly stated that he was happy to make said calls. Each time, Kapur became more aggressive towards Cohen. Cohen had to ask Kapur repeatedly to take this discussion off the call before she finally relented. Kapur was not disciplined in any way. Racek was informed of this by Cohen directly after the call, but her reply was

that she did not want to hear about it, investigate or speak to others who were on the call as to what happened. Instead, she said, "you two are the leaders of the team and should be working together." This is a stark difference to how vague complaints of unprofessionalism levied against Cohen were handled.

20. That same day, Cohen complained to Racek about Kapur's discriminatory actions. Cohen highlighted the double standard between the way he and female employees, such are Kapur, are treated and allowed to act. Rather than address Cohen's legitimate concerns about gender discrimination, Racek instead replied, "what are you going to do, sue the company for discrimination?" Cohen explained that he was not looking to sue Respondent, but instead wanted to be able to work free of discrimination. Cohen asked Racek to speak with others who were on the call, but she refused to do so. Cohen said he would follow up with a formal email and include Moonsammy as previous incidents of discrimination had not been addressed. Racek took no action to address Cohen's complaints.

21. On or about November 10, 2021, Cohen, as he indicated the day prior, emailed Racek detailing Kapur's actions and complaining that he was being discriminated against.

22. That same day, Racek, after reading Cohen's email, called him and began screaming at Cohen. Racek falsely claimed that Cohen's email was inaccurate and that she was putting Cohen "on notice."

23. That same day, Cohen emailed Moonsammy, attaching the email that he sent to Racek and asking what the next steps would be in light of his complaint. Rather than address his complaint, or provide any guidance, Moonsammy responded that she was not sure what Cohen was asking. Moonsammy emailed Cohen back asking if they could speak the following week.

24. On or about November 16, 2021, Moonsammy advised Cohen that Respondent was going to terminate him at the end of the year but in light of his email (complaining of discrimination), Respondent instead wanted Cohen to choose between immediate termination or termination as the end of the year. This ended Defendant's retaliation after Racek put Cohen "on notice" following his complaint of discrimination. Cohen chose to stay until the end of the year in order to have time to search for a new position.

25. While Respondent claims it intended to terminate Cohen at the end of the year due to a restructuring, alleging that it did not need two (2) Executive Directors, Respondent retained Kapur despite the fact that she had less experience than Cohen, she had been trained by Cohen, was employed by Respondent for less time, and had engaged in discriminatory actions towards Cohen. Moreover, Cohen trained and supervised hires, including Kapur, was lead on more conferences than any other IR team member at the time, had been the second in charge when Racek was out of the office since 2014, opened a new channel and brought in allocators from Canada, brought in more Advisory Board/

      Speakers for one of the largest conferences (Public Funds Round Table) than any other IR team member (which impacts Respondent's standing in the industry, and can have a flow-on effect for the sales team seeking to make the Respondent an attractive prospect). Notwithstanding Cashman's assertion that Cohen was "not a good people manager", he continued to train new hires, one of whom told him that she found him helpful and appreciated his assistance and helping her progress, both in July, and again before she quit her employment at Defendant around November 2021.

26. In or around March of 2022, Respondent promoted Lauren Feldman to Executive Director Global Head, Wealth Management which belies its claim that it did not want to have two Executive Directors, notwithstanding the changes in titles.

**AS A FIRST CAUSE OF ACTION**
**<u>FOR DISCRIMINATION UNDER FEDERAL LAW</u>**

1. Plaintiff repeats, reiterates, and realleges each and every allegation made in the above paragraphs of this complaint.

2. Plaintiff has been subjected to a hostile work environment, and/or adverse employment actions, as well as an atmosphere of adverse employment actions based on his gender and/or in retaliation for his opposition to discriminatory practices. Defendant Investment's actions are in violation of the Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000-e, *et seq*.

3. By reason of Defendants' violation of Plaintiff's rights, Plaintiff has suffered a loss of monetary benefits associated with his employment, in addition to suffering physical, emotional and other damages.

WHEREFORE, Plaintiff demands judgment against Defendants for all compensatory, emotional, physical, lost pay, front pay, injunctive relief, and any other damages permitted by law. It is further requested that this Court grant reasonable attorneys' fees and the costs and disbursements of this action and any other relief to which Plaintiff is entitled. Plaintiff demands a trial by jury.

Dated: Seaford, New York
August 5, 2024

RICOTTA & MARKS, P.C.
*Attorneys for Plaintiff*
2174 Jackson Ave.
Seaford, New York 11783
(347) 464-8694

_____/s_____
MATTHEW MARKS, ESQ.